# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR-11-1903-TUC-RCC-DTF |
| Plaintiff, | |
| vs. | **REPORT AND RECOMMENDATION** |
| Billy John Smith, | |
| Defendant. | |

Pending before the Court is Defendant's Motion to Suppress Evidence. (Doc. 44.) The Government responded in opposition and Defendant replied. (Docs. 77, 85.) This matter came before the Court for a hearing and a report and recommendation as a result of a referral, pursuant to LRCrim 5.1. Defendant's motion was set for evidentiary hearing and evidence was heard on February 11 and 12, 2013. (Docs. 86, 87.) Defendant was present and represented by counsel. This matter was submitted following oral argument at the conclusion of the hearing and taken under advisement.

Defendant moves to suppress statements he made on three occasions. Having now considered the matter, the Magistrate Judge recommends that the District Court, after its independent review, deny Defendant's Motion to Suppress on all grounds.

## I.

## **FACTUAL FINDINGS**

Dr. Jessica Sage has been a psychologist with the United States Penitentiary in Tucson (USP Tucson) since April 2009. (RT 2/11/13 at 16, 17.)[1] Dr. Sage began treating Smith upon his arrival at USP Tucson. (*Id.* at 19, 234.) She saw him regularly during her rounds in the Special Housing Unit (SHU) where he was housed. If the defendant requested, she would have him pulled out of his cell to a private area where they could speak confidentially. (*Id.* at 20, 25.) Dr. Sage described rounds as a time for her to check-in with the inmate and see whether he needed a private consultation. (*Id.* at 62.)

On November 15, 2010, Dr. Sage stopped by Defendant Smith's cell for two to three minutes around 3:00 p.m. to ask how he was doing. (*Id.* at 18, 22, 24, 49.) The Defendant said that he was "good" and had no issues. (*Id.* at 23, 231.) She then returned some in-cell assignments to him with written comments and provided a new anger management workbook. (*Id.* at 63-64.) They did not have any therapeutic discussion. (*Id.* at 24.)

On November 15, 2010, Thomas Schneider was a range officer working in SHU (RT 2/11/13 at 171.) He was notified there was an incident on A range in SHU and immediately responded to find Counselor Olivares outside Smith's cell. (*Id.* at 171, 174-75.) Smith testified that he had called out to Counselor Olivares, "I killed my cellie, get me out of here." (*Id.* at 246.) Officer Schneider saw inmate Hawpetoss lying unresponsive in the cell. (*Id.*)

After additional staff responded, Officer Schneider removed Smith from his cell and placed him in the sallyport of a recreation cell. (*Id.* at 176-77.) Officer Schneider then began videotaping Smith, pursuant to a captain's order. (*Id.* at 177.) He stood about 10 feet away

---

[1] "RT" refers to the Reporter's Transcript of the February 11 and 12, 2013 evidentiary hearing. (Docs. 92, 93.) "Ex." refers to the exhibits admitted at that hearing. (Doc. 90.)

- 2 -

1  from Smith and did not speak or make any gestures while recording.[2] (*Id.* at 178.) Smith was
2  talkative and tried to elicit a responses from Officer Schneider. (*Id.* at 179.) Smith testified
3  that he believed the camera was only recording his actions not his statements. He thought
4  he was just talking to Officer Schneider. (*Id.* at 252.) He asserted that he would not have
5  spoken if he had known his voice was being recorded. (*Id.* at 252, 253.) Smith testified that,
6  while he was in the sallyport, he overhead some conversation concerning the suicide cell and
7  believe it probably was about him but he did not know for sure. (*Id.* at 258.)

8       Dr. Sage also responded to the SHU. (*Id.* at 23.) Officers informed her that Smith
9  admitted killing his cellmate. (*Id.* at 26-27.) She determined, after consulting with the chief
10 of psychology, that Smith should be placed on suicide watch due to his history of self-harm
11 and the statements he had made. (*Id.* at 26-27; Gov't Ex. 2.) Dr. Sage did not have contact
12 with Smith before placing him on suicide watch, nor was she aware whether or when he
13 would be interviewed by the FBI. (RT 2/11/12 at 28-29; Gov't Ex. 3.)

14      In November 2010, Captain Andrew Cooper supervised the unit that investigated
15 prohibited acts by inmates. (RT 2/11/12 at 117-18.) On the evening of November 15, Smith
16 was brought from the sallyport in the recreation cell area into an office in SHU with Captain
17 Cooper and FBI Special Agent John DeSouza.[3] (*Id.* at 122.) Special Agent DeSouza advised
18 Smith of his *Miranda* rights and Smith invoked his right to an attorney, so he was not
19 questioned that night. (*Id.* at 123, 197, 199.)

20      At the evidentiary hearing, Smith correctly explained the meaning of his *Miranda*
21 rights and stated that he had the same understanding in November 2010. (*Id.* at 229.) Smith
22 testified that he did not want a lawyer and had wanted to talk to the FBI but because Special

---

[2] Review of the video confirms that Officer Schneider did not initiate any conversation with Smith nor make any verbal response. (Gov't Ex. 15.) Smith asked the officer numerous questions and made several incriminating statements. (*Id.*)

[3] Special Agent DeSouza had been an FBI special investigator for 24 years and had been stationed at USP Tucson for 5 years. (RT 2/11/13 at 193.)

1 Agent DeSouza did not ask him questions he became annoyed and requested a lawyer. (RT
2 2/12/13 at 5.) Smith testified that he thought if he talked maybe he wouldn't have to go to
3 suicide watch. (*Id.* at 20-21.) Captain Cooper did not know at that time that Smith was to be
4 placed on suicide watch. (RT 2/11/13 at 124, 126.)

5 While Lieutenant Jones was escorting Smith from the SHU to the medical area, Smith
6 told Lt. Jones that he became annoyed because they did not ask questions. (*Id.* at 257.) Lt.
7 Jones explained to Smith that they had wanted him to tell them what had happened. (*Id.* at
8 257, 260.) Smith testified that he then requested to speak with the FBI, hoping that would
9 help him avoid the suicide cell. (*Id.* at 257-58, 260.) Special Agent DeSouza was unwilling
10 to speak with Smith that night because he had invoked his rights.[4] (*Id.* at 260; RT 2/12/13 at
11 25.) Smith was placed on suicide watch and Dr. Sage made a clinical decision to conduct
12 a suicide assessment the next day to allow things to settle down. (RT 2/11/13 at 31.)

13 An inmate on suicide watch is provided only a mattress, blanket and suicide smock.
14 (*Id.* at 27.) Smith testified that he was very cold and only slept for 5 or 6 hours. (*Id.* at 262-
15 63.) Smith said he was given bread and butter and a piece of cake for dinner and provided
16 breakfast in the morning. (*Id.* at 261, 263.)

17 Dr. Sage conducted a suicide risk assessment the following morning. (*Id.* at 32.)
18 According to Dr. Sage, she advised Smith that his statements would not be kept confidential
19 and that she would not discuss the incident involving his cellmate. (*Id.* at 32-33, 39.)
20 According to Smith, Dr. Sage did not advise him about confidentiality but he believed the
21 conversation was being recorded. (*Id.* at 264.)

22 Smith testified that the first thing Dr. Sage asked him was why he refused to talk to
23 the FBI. (*Id.* at 263-64.) Smith said he told Dr. Sage that he wanted to speak with the FBI and

---

25 [4] Smith recalled that Agent DeSouza came to the medical unit to see him and
26 told Smith he couldn't talk to him because he had requested a lawyer (RT 2/11/13 at 260),
while Agent DeSouza testified that he saw Smith in passing that night and refused to
27 respond when Smith tried to engage him in conversation (RT 2/12/13 at 25-26).

28
- 4 -

1  asked her if he could go back to SHU if he did. (*Id.* at 265; RT 2/12/13 at 7.) Although Dr.
2  Sage did not tell him he would be taken off suicide watch if he spoke with the FBI, Smith got
3  the impression from Dr. Sage's body language and facial expressions that if he wanted to get
4  out of suicide watch he needed to talk to the FBI. (RT 2/11/12 at 45, 265, 266, 277; RT
5  2/12/13 at 7.)

6  Dr. Sage testified that when she began the suicide assessment Smith was hyper and
7  pacing. (RT 2/11/12 at 33.) Smith was agitated and he complained about being placed on
8  suicide watch. (*Id.* at 33, 82.) He told her that if he wasn't given his clothing and returned to
9  SHU, he would break the sprinkler head. (*Id.* at 47.) Dr. Sage denied advising Smith that if
10 he agreed to speak to the FBI he would be removed from suicide watch. (*Id.* at 45.)

11 During Dr. Sage's assessment, Smith made incriminating statements, but her purpose
12 was to assess Smith's current emotional functioning not question him about the incident. (*Id.*
13 at 34-35; Gov't Ex. 4.) As of the time of her assessment, she concluded that he was calm and
14 doing fine, but she wanted to see how he would handle being served the incident report for
15 the killing, which was to happen later that afternoon. (RT 2/11/13 at 36-37, 38, 43.)

16 After conducting her assessment, Dr. Sage advised Captain Cooper that Smith wanted
17 to speak to the FBI. (*Id.* at 127.) Captain Cooper spoke to Smith to verify his request. (*Id.* at
18 128, 156, 267.) According to Smith, he told Captain Cooper he wanted to talk to get out of
19 the suicide cell. (*Id.* at 267-68.) According to Captain Cooper, he did not discuss with Smith
20 the fact that Smith was on suicide watch or that he could get off suicide watch if he spoke
21 to the FBI. (*Id.* at 128, 132.)

22 Captain Cooper returned with Special Agent DeSouza to meet with Smith in an office
23 in the medical area. (*Id.* at 129.) Smith informed them that he hadn't understood the night
24 before but he wanted to waive his rights and speak to them. (*Id.* at 205.) Smith testified that
25 his statement was voluntary and he waived his rights in order to get out of the suicide cell.
26 (*Id.* at 271, 276.) He stated that he would not have spoken with Captain Cooper and Special
27 Agent DeSouza if he had not been placed in the suicide room. (*Id.* at 276.) At 11:40 a.m.,
28

- 5 -

1 Smith was read his rights and he initialed at the end of each line to acknowledge his
2 understanding and he signed the form. (*Id.* at 130, 271; Gov't Ex. 13.) After Smith provided
3 a summary of the events, Captain Cooper typed an affidavit of Smith's statement and printed
4 it out, which Smith signed. (RT 2/11/13 at 131-32.) They read the affidavit back to him by
5 sections and in entirety to ensure he agreed with what was written. (*Id.* at 208.) Captain
6 Cooper stated that he included any relevant statements about the incident on the 15th and he
7 and Special Agent DeSouza clarified the wording with Smith as necessary. (*Id.* at 151-53,
8 207.) Smith testified that the affidavit was "pretty much exactly what happened," but Captain
9 Cooper may have left out a sentence or two. (RT 2/12/13 at 16-17.) The interview was not
10 recorded. (RT 2/11/13 at 151.) Both Special Agent DeSouza and Smith testified that Smith
11 was not threatened or promised anything for participating in the interview. (*Id.* at 210; RT
12 2/12/13 at 15.)

13 At 2:38 p.m. on November 16, Captain Cooper served an incident report for the killing
14 on Smith in the suicide cell. (RT 2/11/13 at 135, 273.) It was reported to Dr. Sage that Smith
15 had behaved appropriately during his interview with the FBI and when he was served the
16 incident report. (*Id.* at 39-40.) In taking Smith off suicide watch, Dr. Sage relied on the report
17 that he was cooperative, followed directives and was not threatening, not on the fact that he
18 made statements to the FBI. (*Id.* at 42-43.) She removed him from watch at 3:35 p.m. on
19 November 16, and informed him that he would be returning to SHU. (*Id.* at 39, 48, 274.)

## II.

## DISCUSSION

22 Smith seeks to suppress three sets of statements – while in the sallyport in the
23 recreation area, to Dr. Sage, and to the FBI[5] – based on violation of *Miranda*, lack of

---

[5] At the beginning of the evidentiary hearing, the Government indicated an intent to rely on the statements Smith made on November 15 from his cell to Counselor Olivares and Officer Schneider. Defendant clarified that the admissibility of these statements had not been briefed but agreed with the Court that they would be addressed at

- 6 -

1  voluntariness and violation of therapist-patient privilege.

2  **VIDEOTAPED STATEMENTS**

3  Defendant contends that his recorded statements in the sallyport were in response to
4  interrogation and should be suppressed because he was not advised of his *Miranda* rights and
5  the statements were not voluntary.

6  The Government is precluded from using statements arising from custodial
7  interrogation absent the provision of warnings regarding the person's rights. *Miranda v.*
8  *Arizona*, 384 U.S. 436, 444 (1966). Smith was in custody and had not been given *Miranda*
9  warnings at the time he made these statements. The dispute is whether Smith's statements
10 were in response to interrogation. The Supreme Court clarified the meaning of
11 "interrogation" for purposes of *Miranda* as "express questioning or its functional equivalent,"
12 which includes "words or actions on the part of the police . . . that the police should know
13 are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S.
14 291, 300-01 (1980). The focus of this assessment is on the suspect's perceptions of the words
15 or actions. *Id.*

16 All custodial statements do not require warnings, rather, interrogation involves
17 compulsion extending beyond that inherent in custody itself:

18 Confessions remain a proper element in law enforcement. Any statement given
19 freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an
20 individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be
21 interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who
22 calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment
23 and their admissibility is not affected by our holding today.

*Id.* at 299-300 (quoting *Miranda*, 384 U.S. at 478).

24

25 the hearing. (RT 2/11/13 at 4, 5-6.) The parties did not address these statements in their
26 closing arguments. It is not clear Defendant opposes their admission but the Court notes
   they were voluntary and not made in response to interrogation and are, therefore, clearly
27 admissible.

28
- 7 -

The parties both rely on *Innis*, each contending the fact pattern there supports his argument. In *Innis*, while transporting a suspect in a murder case to the police station, one officer initiated a conversation with a second officer, which could be heard by the suspect. *Id.* at 294. The first officer noted that a lot of handicapped children lived in the area and he was concerned that one of them might find the murder weapon and get hurt. *Id.* at 294-95. The second officer agreed with the concern and expressed a need to continue searching for the gun. *Id.* at 295. The suspect then interrupted and told the officers to turn the car around and he could show them the location of the gun. *Id.* The Court found no interrogation because the record did not reveal any knowledge on the part of the police about this suspect's state of mind at that time that would suggest their brief conversation would be likely to elicit an incriminating response. *Id.* at 302-303. Although the police action might be considered "subtle compulsion," it was not interrogation. *Id.* at 303.

Smith argues that the officers should have known that directing a video camera at him while in the holding cell was an inducement to speak and likely to elicit an incriminating response. The use of a video camera alone is not conduct that police should know is reasonably likely to elicit an incriminating response. *See Arizona v. Mauro*, 481 U.S. 520, 527-29 (1987) (finding the tape recording of a conversation between a defendant and his wife in the presence of a silent police officer not interrogation). Here, Smith testified that Schneider did not speak to him even when Smith attempted to engage him in conversation. Moreover, Smith testified that he did not believe the camera was recording audio, he believed it was solely capturing his image.[6] Because Smith did not perceive that the actions of the correctional officer were intended to induce a verbal response, there was no compulsion or

---

[6] Occurrences at the end of the video suggest Smith had an awareness that the camera was recording audio, at least for that later period of time. However, there is no inconsistency because he may not have been aware of the audio earlier in the recording when he made the incriminating statements.

- 8 -

interrogation. *See Innis*, 446 U.S. at 300-01. These statements were volunteered by Smith and there is no basis to suppress them.

**STATEMENTS TO DR. SAGE**

Smith argues that his statements to Dr. Sage on November 15 and 16 should be suppressed. The Government does not intend to offer the statements to Dr. Sage on November 16 during the suicide risk assessment. The parties agreed that they are not asking the Court to make any pre-trial findings regarding those statements. (RT 2/11/13 at 8-9.) Therefore, the Court makes findings in this Order only as to the November 15 statements, which Smith argues are protected by the therapist-patient privilege.[7]

Smith argues that his communication with Dr. Sage on November 15 was for the purpose of exchanging therapeutic worksheets and to assess his mental state and, thus, was made within the context of their ongoing therapeutic relationship. The Government contends these statements are not privileged because they were not confidential nor were they made in the course of diagnosis or treatment.

"[C]onfidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are protected from compelled disclosure under Rule 501 of the Federal Rules of Evidence." *Jaffee v. Redmond*, 518 U.S. 1, 15 (1996). Thus, Smith has the burden of demonstrating that (1) Dr. Sage is a licensed psychotherapist, (2) his communications with her were confidential, and (3) the statements were for the purpose of diagnosis or treatment. *United States v. Romo*, 413 F.3d 1044, 1047 (9th Cir. 2005).

Dr. Sage is a licensed psychotherapist, however, the parties dispute whether the communication was therapeutic and confidential. Whether the communication occurred in

---

[7] In his reply brief, Smith stated that he would be relying upon other psychological records from before and after November 15, 2010. (Doc. 85 at 4.) No additional psychological records were admitted at the hearing, therefore, any confidentiality or privilege that might attach to those records is not addressed.

- 9 -

the course of diagnosis or treatment requires an assessment of the totality of the circumstances and may include:

> the historical nature of the relationship between the individual and his confidante; the patient's purpose in making the communication; the nature of the contact; the timing and location of the communication; objective data, such as medical records, which corroborate the counseling contact; and whether mental health services were provided or requested during the communication.

*Id.* An ongoing patient-therapist relationship does not in itself establish that a particular contact invokes the therapeutic privilege. *Id.* The Court looks at both the therapist's purpose in the meeting and the patient's purpose in communicating. *Id.* at 1048.

Although Dr. Sage and Smith had an ongoing therapeutic relationship, the Court finds the exchange on November 15 is not protected by the privilege. The communication was initiated by Dr. Sage, while on "rounds," to exchange materials and do a brief check on Smith. The contact lasted a few minutes and took place at Smith's cell door. Dr. Sage's record of the exchange classified it as a "High Security Contact," and she did not consider it therapeutic. (Gov't Ex. 1; RT 2/11/13 at 99.) Smith testified that he had no intention of communicating anything of substance during the contact and he did not request any services. (RT 2/11/13 at 231, 232, 236.) Dr. Sage testified that her written comments on the documents she returned to Smith were therapeutic feedback but the government does not seek to offer them. (*Id.* at 64.) Such written materials exchanged between Dr. Sage and Smith would likely be therapeutic and protected. In contrast, the verbal exchange did not involve diagnostic or therapeutic services. It amounted to an opportunity for Smith to request future services, which he did not.

Additionally, Smith testified that his cellmate was present (although sleeping) and that an inmate across the hall was within earshot. (*Id.* at 231, 232.). Smith had no expectation that the communication was confidential and it was not. Therefore, the communication was not confidential and not privileged.

The psychotherapist-patient privilege does not provide a basis to suppress these statements.

## STATEMENTS TO THE FBI

Smith argues that his statements to the FBI on November 16 should be suppressed because they were not voluntary and violated *Miranda*. The crux of Defendant's argument is that Smith's incriminatory statements to Dr. Sage on November 16 during the suicide risk assessment and his confession that day to the FBI were involuntary because he believed talking about the killing was necessary to get off suicide watch. Although the Government is not seeking to introduce the November 16 statements to Dr. Sage, Smith relies upon them to demonstrate why the statements to the FBI should be suppressed. He contends he was compelled to speak to Dr. Sage and was not provided *Miranda* warnings and the taint from that statement had not attenuated when he provided incriminating statements to the FBI.

### **Voluntariness**

The Court first assesses the voluntariness of Smith's statements to Dr. Sage, because it is relevant to his statements to the FBI, and then assesses whether his statements to the FBI were voluntary.

Even if the procedural safeguards of *Miranda* are satisfied, a defendant is deprived of due process if his conviction is founded upon an involuntary confession. *See Dickerson v. United States*, 530 U.S. 428, 432 (2000). To ensure due process, the test for determining the voluntariness of a suspect's confession is whether, considering all the circumstances, the government obtained the statement by physical or psychological coercion or by inducement so that the suspect's will was overcome. *See United States v. Coutchavlis*, 260 F.3d 1149, 1158 (9th Cir. 2001) (citing *Haynes v. Washington*, 373 U.S. 503, 513-14 (1963)). The circumstances to be considered include: (1) whether there was police coercion; (2) the length of the interrogation, its location and its continuity; (3) whether police advised the suspect of his rights; and (4) whether there were any direct or implied promises of a benefit. *Clark v. Murphy*, 331 F.3d 1062, 1072 (9th Cir. 2003). "A statement is involuntary if it is extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence." *Id.* (quoting *Hutto v. Ross*, 429 U.S.

1   28, 30 (1976)). Courts also consider the defendant's age, education, the nature of any
2   questioning, and the use of any physical punishment such as the deprivation of food or sleep
3   to determine voluntariness. *See United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir.
4   2003) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). "In short the true test
5   of admissibility is that the confession is made freely, voluntarily, and without compulsion or
6   inducement of any sort." *Haynes*, 373 U.S. at 513-14.

<u>November 16 Statements to Dr. Sage</u>

Smith's statements to Dr. Sage did not involve coercion or inducement. Dr. Sage testified that the focus of the assessment was Smith's mental state not the events of November 15. There is no evidence that Dr. Sage asked Smith any questions to illicit information about the killing. Smith said that he "just started talking" and "talked more than she asked questions." (RT 2/11/13 at 264, 265.) And, Dr. Sage's uncontradicted testimony was that she re-directed Smith when he began talking about the incident and told him she was there only to assess his mental health functioning. (*Id.* at 34-35.) Dr. Sage made no promises to Smith.

Smith argues that if he refused to cooperate with Dr. Sage he would not get off suicide watch. Even if true, cooperating with Dr. Sage did not require Smith to make incriminating statements about his alleged crime.[8] This comports with his prior suicide watch experiences. Smith stated that to end prior suicide watches he had to talk to someone and tell them he was not suicidal, but he did not have to confess to any crimes. (RT 2/12/13 at 9.) According to his own testimony, Smith believed that to get off suicide watch he needed to talk to the FBI not that he was obligated to talk to Dr. Sage. (RT 2/11/13 at 264-66.)

Smith also argues that his statement was involuntary because he had been deprived

---

[8] Smith also made an argument that his Fifth Amendment privilege was self-executing with respect to his statements to Dr. Sage on November 16 because they were made under penalty of indefinite suicide watch. Because the Government is not seeking to introduce those statements the Court need not reach the argument.

- 12 -

of clothing and other items for a night and held in a cold cell, which amounted to punishment. His placement in the cell was reasonable based on his history of self-harm, the crime for which he was being investigated and the incriminating statements he had made about the crime. Although Smith intensely disliked the suicide cell and it provided limited comforts, he was not deprived of his basic needs nor subjected to punishment. Smith was provided food in the evening and morning, and testified that he slept for 5 to 6 hours in the suicide cell. The suicide assessment was not excessive and lasted no more than thirty minutes. (*Id.* at 265.) Smith also argues that his history of mental health problems made him susceptible and vulnerable. There is no testimony to that effect nor any evidence that Dr. Sage took advantage of his mental health problems to extract incriminating statements from him.

In sum, the evidence as a whole demonstrates that Smith's statements to Dr. Sage were voluntary.

<u>November 16 Statements to the FBI</u>

Smith argues that his statement to the FBI was involuntary because, after invoking his *Miranda* rights on November 15, he was placed on suicide watch and could only be removed after cooperating during his FBI interview. The evidence does not support his argument. Despite the timing – Smith's place in the suicide watch cell immediately following the invocation of his *Miranda* rights – there was no correlation between the two and Smith had knowledge of that. Before the FBI attempted to interview him, Smith had overhead discussions about the suicide cell and thought it likely was in reference to him. (RT 2/11/13 at 258.) Dr. Sage ordered Smith onto suicide watch at 4:20 p.m. on the 15th (Gov't Ex. 3), and his meeting with the FBI occurred just before 7 p.m. that evening (Gov't Ex. 12). At the time Dr. Sage decided to place Smith on suicide watch she had no knowledge whether he already had been interviewed by the FBI or when such an interview would take place. (RT 2/11/13 at 28-29.) Further, there is no evidence suggesting that Smith's housing for that night was determined after the FBI meeting. Contrariwise, all the testimony, including Smith's,

1  agree that as soon as the FBI was done talking to him he was escorted to the medical area for
2  suicide watch. Smith testified that he had decided, with no input from anyone else, that he
3  wanted to talk to the FBI because he thought that might help him avoid the suicide cell. (RT
4  2/12/13 at 20-21.) Additionally, as discussed above, Smith's placement on suicide watch
5  overnight was reasonable and did not deprive him of his basic needs.

6  Smith testified that he concluded during the suicide risk assessment, based on Dr.
7  Sage's body language, that he needed to talk to the FBI if he wanted to be removed from
8  suicide watch. No one ever threatened Smith with extended suicide watch if he did not
9  confess nor promised that he would be removed from suicide watch if he cooperated with the
10 FBI. It was Smith who inquired of Dr. Sage whether he could be returned to SHU if he talked
11 to the FBI and she made no promises. (RT 2/11/13 at 265.) Smith's interpretation of Dr.
12 Sage's body language and facial expressions was unreasonable and not suggestive of
13 coercion in light of all the evidence.

14 Smith's meeting with the FBI was brief, lasting less than fifteen minutes according
15 to Smith. (*Id.* at 273.) His statement was proceeded by *Miranda* warnings. Neither the FBI
16 nor Dr. Sage promised Smith anything for talking to the FBI and he was not threatened with
17 any consequences for not talking. He testified that he had wanted to speak to the FBI since
18 the evening of the 15th and he initiated the contact with the FBI that morning. This statement
19 was voluntary.

20 ### ***Miranda***

21 Smith claims that he did not voluntarily waive his *Miranda* rights before making
22 statements to the FBI. He argues that he executed the rights waiver and agreed to speak with
23 the FBI because he thought it was the only way to get off suicide watch. Further, his
24 statement to the FBI was obtained after he made statements to Dr. Sage with no *Miranda*
25 warning.

26 For incriminating statements obtained during a custodial interrogation to be
27 admissible, any waiver of *Miranda* rights must be voluntary, knowing, and intelligent. *See*

28

- 14 -

*Miranda*, 384 U.S. at 479. A waiver is voluntary if "it was the product of a free and deliberate choice rather than intimidation, coercion or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). There is a presumption against waiver, and the Government bears the burden of proving a valid waiver by a preponderance of the evidence. *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *United States v. Bernard S.*, 795 F.2d 749, 751 (9th Cir. 1986). Pursuant to *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981), after an accused has been advised of his rights under *Miranda*, if he invokes his right to counsel, he cannot waive that right or be further questioned until counsel has been made available, unless the accused himself initiates further contact with law enforcement.

First, the Court assesses whether Dr. Sage had an obligation to provide Smith with a *Miranda* warning and concludes she was under no requirement. Dr. Sage's suicide assessment was a therapeutic interaction with a patient not an interrogation. Dr. Sage did not question Smith about the events of November 15; rather, she told him that was not the purpose of their discussion and she attempted to re-direct him when he chose to focus on the killing. There is no evidence that Dr. Sage inquired about the alleged crime or that Smith felt compelled to talk to her about the crime.

Smith's reliance on *Estelle v. Smith*, 451 U.S. 454, 467-68 (1981) is misplaced. In *Estelle*, the statements occurred during a court-ordered psychiatric examination designed to be used during the adversarial process of trial. Not so here. Dr. Sage's interview with Smith was separate from the criminal process that was beginning and related strictly to assessing his emotional state to determine any necessary services or restrictions within the prison setting. (RT 2/11/13 at 34, 81.) For these reasons, the Court finds that Dr. Sage was not required to provide Smith *Miranda* warnings prior to conducting the suicide assessment.

Next, the Court assesses Smith's *Miranda* waiver when questioned by the FBI on the morning of November 16. As an initial matter, because Smith initiated contact with the FBI there is no Fifth Amendment violation arising from his prior request for counsel. *See Edwards*, 451 U.S. at 485; *Minnick v. Mississippi*, 498 U.S. 146, 156 (1990).

1    Smith argues his waiver was not voluntary but was coerced by his treatment overnight
2 and because it was the only avenue to get off suicide watch. For the same reasons the Court
3 found Smith's statements voluntary, the Court finds Smith's *Miranda* waiver voluntary.
4 Moreover, Smith testified that he understood his rights and wanted to speak with the FBI, he
5 only invoked his rights the first night because he was annoyed and did not understand why
6 they were not asking him questions. Although Smith may have thought talking to the FBI
7 would influence his suicide watch status, he freely made a deliberate choice to waive his
8 rights and make a statement.

9    Smith also argues that his *Miranda* rights were violated because he was interrogated
10 by Dr. Sage, then provided a *Miranda* warning and interrogated again by the FBI. Smith
11 contends this "question-first" process was intentionally employed by the FBI and, even if it
12 wasn't, his *Miranda* rights were still violated by the process. A court "must suppress
13 postwarning confessions obtained during a deliberate two-step interrogation where the
14 midstream *Miranda* warning – in light of the objective facts and circumstances – did not
15 effectively apprise the suspect of his rights." *United States v. Williams*, 435 F.3d 1148, 1157
16 (9th Cir. 2006).

17    For several reasons the Court finds these arguments without merit. First, Dr. Sage was
18 under no obligation to provide a *Miranda* warning to Smith. This is based, in part, on the fact
19 that Dr. Sage did not interrogate Smith, thus, there was no two-step interrogation. Second,
20 there is no evidence that Dr. Sage and the FBI coordinated their interviews of Smith,
21 therefore, the sequence was unintentional.

22    When a court does not find the two-step procedure to have been intentionally
23 employed, it applies a different standard:

> absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement.

*Oregon v. Elstad*, 470 U.S. 298, 313 (1985). If, however, the initial statement pre-warning is involuntary, "the court must examine whether the taint dissipated through the passing of time or a change in circumstances." *Williams*, 435 F.3d at 1153 (quoting *Missouri v. Seibert*, 542 U.S. at 600, 628 (2004) (O'Connor, J., dissenting)). The Court found Smith's statement to Dr. Sage was voluntary; therefore, Smith's warned statements to the FBI are admissible. *See Elstad*, 470 U.S. at 313. Defendant focused extensively on whether the taint from the statements to Dr. Sage had dissipated when Smith spoke to the FBI. However, because Smith's statements to Dr. Sage were voluntary, the Court does not reach this argument.

### **Failure to Record Statement**

Smith argues that his right to due process was violated because the FBI did not make a recording of his interrogation. He acknowledges that governing law does not require that a defendant's statements be recorded. *See United States v. Smith-Baltiher*, 424 F.3d 913, 925 & n.10 (9th Cir. 2005). However, he argues that under the circumstances of this case and the ease of recording a statement today, the Court should exclude his statements to the FBI. The law does not require the recording of statements and the Court sees no basis to extend the rule in this case.

## **III.**
## **CONCLUSION**

The Court concludes none of Smith's statements that the Government seeks to introduce should be suppressed. Smith's videotaped statements while in the recreation area were voluntary and not the product of interrogation. Smith's statements to Dr. Sage on November 15 are not protected by the therapist-patient privilege. Smith's November 16 statements to the FBI were voluntary and not obtained in violation of *Miranda*.

## **IV.**
## **RECOMMENDATION**

In view of the foregoing, it is recommended that, after its independent review of the record, the District Court deny Defendant's Motion to Suppress. (Doc. 44.) Pursuant to

1  Federal Rule of Criminal Procedure 59(b)(2), any party may serve and file written objections
2  within 14 days of being served with a copy of this Report and Recommendation. A party may
3  respond to the other party's objections within fourteen days. No reply brief shall be filed on
4  objections unless leave is granted by the district court. If objections are not timely filed, they
5  may be deemed waived. The parties are advised that any objections filed are to be identified
6  with the following case number: **CR-11-1903-TUC-RCC**.

DATED this 25th day of March, 2013.

D. Thomas Ferraro
United States Magistrate Judge